IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA, as subrogee of
PANATTONI INVESTMENTS, LLC                                                    PLAINTIFF

V.                                                            CIVIL ACTION NO. 2:09CV200-B-S

BRANDENBURG INDUSTRIAL SERVICE
COMPANY                                                                       DEFENDANT

**MEMORANDUM OPINION**

This cause comes before the court for a ruling subsequent to the bench trial held on January 24-25, 2011. Upon due consideration of the testimony, exhibits, and arguments, the court is ready to rule.

Factual and Procedural Background

On February 5, 2008, an F-4 tornado directly struck and severely damaged a 910,000 square foot commercial warehouse facility owned by Panattoni Investments, LLC, ("Panattoni") in Southaven, Mississippi. The tornado destroyed a large portion of the building's roof, knocked down concrete exterior walls, tossed fully-loaded 18-wheeler trailers into the building, and did substantial damage to large storage racks inside the building which contained heavy radiators and automotive parts owned by Panattoni's tenant, Proliance (formerly known as Go/Dan Industries, Inc.). Proliance also owned the storage racks, which were attached to the building's concrete slab foundation by a mechanical nut and bolt system.

Panattoni hired its sister company, Panattoni Construction ("PanCon"), to serve as general contractor for the demolition and reconstruction of the building after the tornado. PanCon consulted with Panattoni, Proliance, Panattoni's insurer, plaintiff/subrogee Travelers Property Casualty Company of America ("Travelers"), and Proliance's insurer, Allianz Global

U.S. Insurance Company ("Allianz"), and hired defendant Brandenburg Industrial Service Company ("Brandenburg") to perform demolition and clean-up work at the facility. The group contemplated a "team" approach to the project with Brandenburg taking its primary direction from PanCon and Proliance. Brandenburg entered into a contract with PanCon which addressed the team approach by providing that Brandenburg "shall work with Panattoni Construction, Inc., and Travelers' representative to minimize the amount of damage to other portions of the building and site." The agreement also provided that Brandenburg would "[d]emolish the steel structure and the concrete tilt-up panels per Panattoni's direction and demolish the racking per Proliance's direction at the connection points."

Travelers retained Young and Associates to oversee Brandenburg's operations and to determine the amount of Brandenburg's work attributable to the building demolition and the racks and products removal and demolition so that Panattoni and Proliance could be billed proportionately for Brandenburg's services. On February 14, 2008, Bob Gehringer with Young and Associates wrote Travelers' representative and project claims adjuster, Richard Harris, stating, "If there is anything in particular that you wish for us to monitor closely, please reply back with those areas, concerns, or situations."

Proliance's insurance representative, VeriClaim, through its agent Jack Peterson, ultimately determined that it was more economical not to salvage the racks but to replace them with new ones. The decision was ultimately made that Brandenburg would use heavy equipment to push over the storage racks without disconnecting the nuts and bolts which attached the racks to the building's concrete slab foundation. This method resulted in numerous potholes in the

slab. The entire concrete slab was ultimately replaced at a cost in excess of $3 million paid by Travelers.

Travelers asserts that at least $1.43 million of the cost of the slab replacement is directly attributable to Brandenburg's alleged contractual breach and negligence. Travelers therefore filed the present action in this court on November 9, 2009, seeking subrogation in this amount based on its theories of Brandenburg's breach of contract and negligence. A bench trial was held in this cause on January 24 and 25, 2011. The court subsequently took the matter under advisement and is now ready to rule.

## Findings of Fact and Conclusions of Law

Travelers contends that Brandenburg made the unilateral decision to push over the storage racks that remained standing after the tornado with heavy equipment rather than removing the racks by manually unfastening them at their connection points. This method caused damage to the concrete slab, leaving small potholes and other surface defects throughout the space. Travelers asserts that "Brandenburg was solely and exclusively responsible for the means and method of" rack removal and did not seek input or direction from Travelers, PanCon, Panattoni, Young, Proliance, or Allianz. According to Travelers, by taking this unilateral approach, Brandenburg breached its contract with PanCon, which called for a "team" approach through consultation with the other companies involved in the project and required that the defendant make all attempts to minimize further damage to the facility. Travelers further asserts that the contract created a duty on the part of Brandenburg which it breached through its negligence.

As a preliminary matter the court addresses the defendant's assertion that Travelers and Panattoni do not have standing to bring a breach of contract claim because they are not parties to the contract. The contract at issue is between Brandenburg and PanCon, and PanCon is not a party to this action. Mississippi law, however, provides a remedy for strangers to the contract when a contractual provision is made primarily for their benefit. As the Mississippi Supreme Court has explained:

> A third party can enforce a contractual provision made primarily for his benefit even if he was not a party to the contract. As to such third-party beneficiaries, the controlling principle of law . . . is that one not a party to a contract can sue for a breach thereof only when the condition which is alleged to have been broken was placed in the contract for his direct benefit. A mere incidental beneficiary acquires by virtue of the contractual obligation no right against the promisor or the promisee. . . . In other words, for the third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for his benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms. There must have been a legal obligation or duty on the part of the promisee to such third person beneficiary . . . connecting the beneficiary with the contract.

*Aladdin Const. Co., Inc. v. John Hancock Life Ins. Co.*, 914 So. 2d 169, 179 (Miss. 2005) (internal citations omitted). The *Aladdin* court outlined the specific requirements for third-party recovery as follows:

> (1) When the terms of the contract are expressly broad enough to include the third party either by name or as one of a specified class, and (2) the said third party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promisee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.

*Id.* (quoting *Yazoo & M.V.R.R. v. Sideboard*, 133 So. 669, 671 (Miss. 1931)).

In the present case, Travelers' insured, Panattoni, owned the Southaven facility and obviously had a direct interest in the facility's demolition and repair after the tornado. Further, this direct interest was contemplated in the contract itself, as Panattoni's insurer, Travelers, was

4

explicitly named in the provision requiring that Brandenburg "shall work with Panattoni Construction, Inc., and Travelers' representative to minimize the amount of damage to other portions of the building and site"; and certainly PanCon, as a sister company to Panattoni, had a substantial and articulate interest in the welfare of Panattoni with respect to the contract. For these reasons, the court finds that Travelers, as subrogee of Panattoni, does have standing to sue on the contract between PanCon and Brandenburg.

The determinative question in this case is whether Brandenburg acted on its own in choosing its method of rack removal or whether it consulted with PanCon and Travelers, Travelers' representative, or Travelers' insured, Panattoni. The testimony presented at trial conflicts on this point, so the court must judge witness credibility and weigh the evidence in order to resolve this issue of fact. It is, of course, the court's role in a bench trial to make credibility determinations and, when both parties present evidence in support of their respective positions, to determine in whose favor the weight of the evidence tips. *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 306 (5th Cir. 2009); *Nolan v. Golden Rule Ins. Co.*, 171 F.3d 990, 994 (5th Cir. 1999).

The contractual provisions at issue in this case are found in the "Scope of Work" addendum to the February 14, 2008, contract between Brandenburg and PanCon. First, Travelers asserts that Brandenburg breached the clause which required Brandenburg to "work with Panattoni Construction, Inc., and Travelers' representative to minimize the amount of damage to other portions of the building and site." Of equal significance is the clause which required Brandenburg to "[d]emolish the steel structure and the concrete tilt-up panels per

5

Panattoni's direction and demolish the racking per Proliance's direction at the connection points."

Plaintiff's first witness at trial was Travelers' representative and claims adjuster on this case, Richard Harris. Harris received an email from Bob Gehringer with Young and Associates on February 28, 2008, informing him that a decision on the method of rack removal was pending as of that date. Gehringer, whom Harris acknowledged to be the "eyes and ears" of Travelers on this project site, wrote, "As soon as the racks are dealt with either by disassembly and salvage or by scrapping them entirely, Brandenburg will be able to resume the 'building' demolition." In a letter to Jack Peterson on July 31, 2008, Harris acknowledged that he was advised of the possibility that the racks would be torn out. He wrote, "The only thing I ever heard about the racks was in a telephone conversation that I had with you. You brought up the demolition of the racks and that you were probably going to make the decision to tear them out as it was more economical than having them removed." When questioned about these emails, Harris testified that his understanding was always that the racks were to be unbolted, disassembled, and removed as opposed to being pushed down with heavy equipment, though he admitted that he asked no questions about the specifics of the removal and reminded no one of the language in the Brandenburg/PanCon contract requiring the minimization of damages. He stated that he interpreted "tear them out" to mean "not salvage." It would thus appear that Harris believed these discussions regarding rack removal to be about what was to be done with the racks after removal – not how to remove them.

The court is unpersuaded by Harris' position. The language "disassembly and salvage" versus "scrapping them entirely" should have at least prompted Harris to inquire for further

details; though the court is of the opinion that it should have been clear what was meant by these two options. Harris' own letter is an even stronger indicator that Harris had notice of the possibility that the racks would be pushed down. Despite Harris' assertion to the contrary, the language "tear them out" and "having them removed" seems clearly to refer to the method of removal rather than the ultimate fate of the racks themselves, especially considering that the word "removed" is actually used in the statement. The court, therefore, concludes that Harris was on notice of the possibility that the racks would be pushed down or "torn out" as opposed to unbolted, disassembled, and removed. As Harris was Travelers' representative in this matter, this notice is imputed to the plaintiff.

The plaintiff next called Brandenburg employee and Southaven site foreman Ronald Freeman to the stand. Freeman testified that he was directed by PanCon to knock down the racks and that Frankie Borden, PanCon's project superintendent, told him to use heavy equipment to do so. He acknowledged that he never saw the Brandenburg/PanCon contract including the Scope of Work provisions but that he followed Borden's directions throughout the project, stating several times that he answered to Frankie; that Frankie was in charge; and that he did what Frankie told him to do. He further testified that he never received any complaints about Brandenburg's work during the job or after the job. To the contrary, Brandenburg received letters of commendation on its work and subsequently entered into a contract with PanCon on another project.

Borden testified that he witnessed Brandenburg removing racks at the outset of the project by cutting the bolts. He asserted that he missed work from February 28, 2008, until March 4, 2008, to have surgery on his hand and therefore did not witness Brandenburg's work

7

during this time.[1] Borden stated that he never had a meeting or discussion about how Brandenburg was to remove the racks and did not authorize the use of a backhoe for the removal.

Borden's testimony is in direct conflict with that of Ronald Freeman and is contrary to the deposition testimony of Proliance representative John Carrano.[2] In fact, Carrano's testimony reveals that Borden's involvement in all aspects of the project was extensive and pervasive. Carrano testified that Borden and Freeman were to meet each morning to decide what work was to be accomplished that day. He stated he was involved in one such meeting but was uncertain how often the other two actually did meet. He stated, "I know there was a lot of communication going back and forth between those two." As to the extent of Borden's control over the project, Carrano stated, "I do know any time you moved in and around that site, [Borden] had to know about it, and he had to approve it." He further stated, "You knew whose site it was when you got there. I don't care who you knew, you knew [Borden] was the guy." According to Carrano, "You didn't do anything without [Borden] approving it. It was very – he made sure that you knew you had to go to him."

---

[1]On cross-examination the defendant presented worker pay authorization forms signed by Borden and dated during the time he was allegedly off work for his surgery, including February 28 and 29 and March 1 and 2. Borden clarified that he signed these after his return (and apparently back-dated them).

[2]The plaintiff objects to the admissibility of certain statements in Carrano's deposition asserting that they amount to hearsay. Finding that the statements are not being offered to prove the truth of the matter asserted, the court overrules the objection. *See* Note to Subdivision (c), Fed. R. Evid. 801(c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay.") Carrano's testimony is not offered to prove the truth of what was said in discussions between Borden and Freeman but rather to show that the conversations actually took place. The same rationale applies to Carrano's testimony that an email regarding the rack removal decision was sent to Borden. As to the plaintiff's objections asserting Carrano's lack of personal knowledge, it is clear that Carrano based his testimony on his own observations. The court obviously does not consider Carrano's speculation as to what occurred during meetings to which he was not privy.

After Proliance and its insurer determined that it was not cost-effective to have the racks removed by hand, Carrano informed Borden of the decision but did not recall whether he gave Borden a paper copy of the cost analysis or forwarded an email from Jack Peterson. Carrano stated that he verbally told Freeman about the decision. Indeed, in regard to the decision, Carrano stated,

> We had talked about it all along, [Borden] and I and even [Freeman]. We talked about it all along, when that decision was going to come down; did they come back with a decision yet, because that was the last kind of time-consuming activity that either had to be completed or not. So, it wasn't just myself that was waiting for the decision. It was, you know, if we were going to take them down rack by rack, beam by beam, [Freeman] had to call for more people and [Borden] had to go back and redo his timeline as well. The three of us were very aware that a decision was pending.

Though clearly in contravention of Borden's testimony and the plaintiff's position in this case, Carrano's testimony supports the notion that PanCon was on notice of the decision to push over the racks and that Brandenburg did not act unilaterally but rather followed the "team approach" directive set forth in the Brandenburg/PanCon contract.

Chad Lindsay, PanCon project manager during the Southaven project, testified by deposition that he was not present when the racks were being pushed down by Brandenburg but that he "would have to assume [Borden] saw it since he was the on-site superintendent." He stated he recalls no conversation with Borden specific to Brandenburg's pushing over the racks and that Borden never expressed any concern to him about Brandenburg's work.[3]

The final witness called at trial was Anthony Guarnero, Illinois Division Commercial Manager with Brandenburg. Guarnero testified that he received no complaints about

---

[3]The plaintiff objects to Lindsay's testimony as hearsay, speculative, and lacking in personal knowledge. The objection is overruled in accordance with the same rationale set forth in footnote 2, *supra*.

9

Brandenburg's work from PanCon or Panattoni and was unaware of any problem until the present case was filed over a year and a half later. He also testified regarding the change order admitted as Exhibit D-9, which reflects that PanCon approved a $700,000.00 increase for "Remaining Demolition Costs" over Brandenburg's original $2 million contract price.

Consistent with Guarnero's testimony, Frankie Borden admitted that he never put Brandenburg on notice that it was doing anything wrong; never informed Brandenburg that it needed to repair anything; and did not try to offset any damages caused by Brandenburg in paying Brandenburg for its demolition work on the building.

The record further reflects that Brandenburg was ultimately hired by PanCon for another project and that the defendant received letters of commendation for its work at the Southaven facility after the work was completed.

The court has heard the testimony and arguments presented in this case and has examined the exhibits admitted, including the deposition testimony of various witnesses, and is of the opinion that the weight of the evidence is in favor of the defendant Brandenburg. The court finds that Brandenburg acted with reasonable care under the circumstances and was, therefore, not negligent in its work at the Southaven site. As previously stated, the defendant even received letters of commendation for its work on the project. The court further finds that Brandenburg acted in accordance with the Brandenburg/PanCon contract and "Scope of Work" addendum by "work[ing] with Panattoni Construction, Inc., and Travelers' representative to minimize the amount of damage to other portions of the building and site" and by "[d]emolish[ing] the steel structure and the concrete tilt-up panels per Panattoni's direction and demolish[ing] the racking per Proliance's direction . . . ." Although the defendant did not remove the racks "at the

connection points" by unbolting and disassembling by hand, it is clear that all interested and relevant parties were on notice that the course of action to push down the racks through the use of heavy equipment was to take place. The record is likewise clear that no interested party made any objection to this course of action upon receiving such notice; nor during the days when it was being done; nor in the days and weeks and months following the work and are now deemed by this court to have acquiesced in the matter.

## Conclusion

For the foregoing reasons, the court finds in favor of defendant Brandenburg. A separate judgment in accord with this opinion shall issue this day.

This, the 11th day of February, 2011.

                                              */s/ Neal Biggers*
                                              **NEAL B. BIGGERS, JR.**
                                              **SENIOR U.S. DISTRICT JUDGE**